IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>C.W. MINING COMPANY,<br><br>     Debtor | Bankruptcy Case No. 08-20105 |
| RHINO ENERGY LLC and CASTLE VALLEY MINING LLC,<br><br>     Appellants,<br><br>        vs.<br><br>C.O.P. COAL DEVELOPMENT COMPANY and ANR COMPANY, INC.,<br><br>     Appellees. | MEMORANDUM DECISION<br>AND ORDER<br>ON BANKRUPTCY APPEAL<br><br>Case No. 2:13-CV-924-TC<br>(Adversary Proceeding No. 11-2250) |

This appeal arises out of the Chapter 7 involuntary bankruptcy of C.W. Mining Company, former operator of the Bear Canyon coal mine in Utah.

## INTRODUCTION

Appellees C.O.P. Coal Development Company (COP Coal) and ANR Company, Inc. (ANR) (collectively COP) are owners of land on which the coal mine is situated. C.W. Mining Company (the Debtor) had Operating Agreements with COP Coal and ANR before the bankruptcy petition was filed. Paragraph 5 of those agreements sets forth a standard for operating the mine.

After the bankruptcy petition was filed, the Chapter 7 Trustee took possession of the Debtor's mine assets, including the two Operating Agreements. Appellants Rhino Energy LLC

(Rhino Energy) and Castle Valley Mining LLC (Castle Valley) (collectively, Rhino) acquired mine assets from the Trustee through a sale order issued by the bankruptcy court.  As part of that sale, Rhino assumed the Debtor's Operating Agreements with COP Coal and ANR as they were interpreted by the bankruptcy court (in particular, Paragraph 5).

After Rhino began using a mining technique different than the one used by its predecessor, COP Coal and ANR sent Notices of Default to Rhino seeking termination of the Operating Agreements on the basis that Rhino was operating in violation of Paragraph 5.  In response, Rhino Energy and Castle Valley filed an adversary action in the bankruptcy matter seeking a declaration that no default had occurred.  The bankruptcy court, after reviewing Rhino's motion for partial summary judgment concerning the alleged default, held that it did not have jurisdiction over the default dispute, denied the motion, and dismissed the relevant claims. Rhino now appeals that decision.

For the reasons set forth below, the court reverses the bankruptcy court order and remands with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### Previous Rulings and Law of the Case

Although this adversary proceeding between the parties originated in 2011, a series of earlier adversary proceedings, court rulings, and appeals in the underlying bankruptcy proceeding shapes the issues raised in this appeal.  To help the reader understand the court's decision, the

---

[1]The factual and procedural background of this appeal are intertwined, so the court discusses them together in one section.  The appendix for the appeal may be found at Docket Entry No. 28.

court describes certain portions of the bankruptcy proceedings' lengthy and complicated

procedural background that led to the decision on appeal.  This will provide necessary context

and set forth the law of the case.

    1.    <u>2009 Dispute Between Trustee and COP about Paragraph 5 in the Operating
Agreements.</u>

The dispute over the correct standard for performance under Paragraph 5 of the Operating

Agreements was percolating by at least 2009.[2]  At that time, the Trustee had assumed the

Debtor's obligations under those agreements and was sparring with COP over the proper

interpretation of Paragraph 5 of the Operating Agreements.[3]  (Rhino did not come into the picture

until later.)  Paragraph 5 provides that:

> Operator shall **<u>diligently and continuously operate</u>** the subject property
> for the term hereof [with limited exceptions].  Operator shall conduct all
> operations hereunder in a good and minerlike manner and in a manner which will
> result in the **<u>ultimate maximum economic recovery [MER]</u>** of coal from the
> property. . . .
>
> Operator shall, in the operation and development of the premises, comply
> with all applicable Federal, State, and local laws that apply to Operator's mining
> operation and shall conduct its mining operations and take all actions and perform
> all duties required to maintain the Federal and State mining permits and approvals
> relating to the Premises.

(ANR Operating Agreement ¶ 5; COP Coal Operating Agreement ¶ 5 (emphasis added).)

Paragraph 5 is sometimes referred to as the "Continuous Operations Clause."

---

[2]"[B]oth ANR and COP [Coal] have asserted in various papers that defaults have
occurred under their respective operating agreements, including a motion for relief from the
automatic stay that ANR is currently prosecuting so that it may provide the Debtor with a formal
notice of default."  (Findings of Fact and Conclusions of Law Arising from Trial on November
16, 17, 23, and 24, 2009 (Appellant App. 2855-2874) ("November 2009 Trial Order") ¶ 4.)

[3]COP had issued notices to the Trustee alleging default of Paragraph 5 which, if
established, would result in termination of the Operating Agreements.

To resolve that dispute, the Trustee filed an adversary proceeding in 2009 seeking a determination of the meaning of the phrases "diligently and continuously operate" and "maximum economic recovery" in Paragraph 5.[4]  The Operating Agreements do not define those terms.

In November 2009, the bankruptcy court[5] held a trial and, in December 2009, issued Findings of Fact and Conclusions of Law.  The court framed the issue before it as follows:

> At the heart of the dispute between the parties is **the amount of discretion granted to the landlords, [COP Coal] and ANR, to determine how and when the operator must operate in order to fulfill its requirements under [Paragraph 5 of] the operating agreements** to "diligently and continuously operate" in a fashion that will realize the "ultimate maximum economic recovery" or, **in other words, whether the landlords have discretion to impose their own standards** for the safe, efficient and non-wasteful operation of the mine.

(Findings of Fact and Conclusions of Law Arising from Trial on November 16, 17, 23, and 24, 2009 (Appellant App. 2855-2874) ("November 2009 Trial Order") ¶ 7 (emphasis added).)

The Trustee asserted that the Code of Federal Regulations, as interpreted by the Bureau of Land Management (BLM), provided the standard for determining whether default had occurred under Paragraph 5.  Those regulations define "continued operation" and "maximum economic recovery" (MER is a term of art in the mining industry).  The definitions are different than what

---

[4]The Trustee needed a definitive answer because he was seeking permission to "assume and assign the operating agreements . . . in connection with the proposed sale of the mine assets to a third-party purchaser."  (November 2009 Trial Order ¶ 5.)  The bankruptcy court noted that "before the Trustee may assume the operating agreements, he must provide 'adequate assurance of future performance' under the agreements.  What constitutes such future performance must be defined and is a necessary prerequisite to the Court determining whether assumption of the operating agreements is appropriate under § 365(b) of the Bankruptcy Code."  (Id.)

[5]At the time, U.S. Bankruptcy Judge Judith Boulden was presiding over the bankruptcy proceedings. Upon her retirement, U.S. Bankruptcy Judge R. Kimball Mosier took over.

COP Coal and ANR advocated; indeed, those parties contended that they, not the BLM, had

authority to determine whether default had occurred under Paragraph 5.

The bankruptcy court rejected the standard offered by COP.  In the bankruptcy court's

search for an answer to the question of whether the Trustee would be able to provide "adequate

assurance of future performance" of the Operating Agreements, the court stated that it had "no

choice but to interpret the Continuous Operations Clause in the manner suggested by the

Trustee."  (November 2009 Trial Order ¶ 13.)  The court noted that the BLM regulations closely

paralleled the content of Paragraph 5, and that COP Coal and ANR did not present a

> coherent alternative standard for the Continuous Operations Clause . . . to the
> Court.  Essentially, [COP Coal] and ANR argue that the Continuous Operations
> Clause is subject to the whim and caprice of those entities. . . . Joseph Kingston
> even testified that "ultimate maximum economic recovery" could require an
> operator to mine even if such operations were physically possible but
> economically unprofitable and that he would interpret the phrase "diligently and
> continuously operate" differently if a new entity were to take over the Bear
> Canyon Mine.

(Id. ¶¶ 16-17.)  Expressing concern, the court continued:

> Thus, under the standard argued by [COP Coal] and ANR apparently depends on
> whatever may be in Joseph Kingston's head at any particular point in time, **which
> of course is no standard at all.**  There is simply no way for an independent
> operator—or any operator, including Hiawatha [the last operator] or the
> Debtor—to be able to know whether or not it is complying with the Continuous
> Operations Clause under such a "standard," and neither [COP Coal] nor ANR has
> pointed the Court to any other basis such as case law or industry practice for
> interpreting the Continuous Operations Clause in a manner different than the one
> suggested by the Trustee.

(Id. ¶ 19 (emphasis added).)  The bankruptcy court held that Paragraph 5 would be interpreted

according to BLM regulations, that BLM had the authority to determine whether the operator was

complying with Paragraph 5, and that, based on the record before the court, the Trustee was not

in default of the Operating Agreements.  (See id. ¶ 20.)

       2.    Sale Findings and Conclusions and Sale Authorization Order

After the November 2009 Trial Order was issued, the Trustee began his search for a buyer of the mine assets (which included the Operating Agreements) and held an auction.  Ultimately, the Trustee accepted Rhino Energy's $15 million bid.

The Trustee filed his Sale Motion[6] with the bankruptcy court, seeking approval of the proposed assumption and sale.  COP Coal and ANR, as parties to the Operating Agreements being auctioned, objected to the terms of the proposed sale, contending that Rhino could not provide the required adequate assurance of future performance under bankruptcy law Section 365, which requires the following:

> The trustee may assign an executory contract or unexpired lease of the debtor only if (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2)(B) (emphasis added).

In June 2010, the bankruptcy court held evidentiary hearings, during which a representative of Rhino testified that, based on the recommendation of its expert, Rhino would change the mining method from the "longwall method" to the "room and pillar method."  To change the mining method, the mine's Resource Recovery and Protection Plan (R2P2) would need to be amended and approved by the BLM.  At that point, the governing R2P2 was dated

---

[6]See Appellant App. 1215 (describing four motions that made up the Sale Motion).

2006.[7]

COP Coal and ANR essentially argued that the 2006 R2P2 was incorporated into Paragraph 5 and so the longwall mining method could not be replaced by the room and pillar method—that is, the BLM could not approve a new R2P2 without substantively amending the Operating Agreements, because the 2006 R2P2 imposed unalterable obligations on the operator. They further argued that the room and pillar method would not achieve MER and that the change in mining method would wrongfully extend the designated period for mining beyond the date contemplated in the 2006 R2P2.

After the hearings, the bankruptcy court issued findings of fact and conclusions of law in on August 6, 2010 ("Sale Findings and Conclusions").[8]  The Sale Findings and Conclusions accompanied the bankruptcy court's August 4, 2010 Order Authorizing Sale of Mine Assets ("Sale Authorization Order").[9]

In its Sale Findings and Conclusions, the bankruptcy court rejected COP Coal's and ANR's objections, noting that "[a]lthough the Mine Operating Agreements use the term 'ultimate maximum economic recovery' the term is not defined by the Mine Operating Agreements in terms of annual production of coal or in terms of dollars generated.  [COP Coal's] and ANR's

---

[7]"The stipulations imposed by the BLM and accepted by the Trustee . . . require in part that 'Prior to commencement of mining on the Bear Canyon LMU, an update to the [2006] R2P2 shall be required.'" (August 6, 2010 Findings of Fact and Conclusions of Law ¶ 41.)

[8]Appellant App. 1214-1254.

[9]Appellant App. 1134-64.

monetary benefits are covered by the royalties section of the Mine Operating Agreements," a

section wholly separate from Paragraph 5.  (Sale Findings and Conclusions ¶ 36.)

> The purpose of paragraph 5 of the Mine Operating Agreements is to ensure that
> the "Operator . . . in the operation and development of the premises, comply with
> all applicable Federal, State and local laws that apply to the Operator's mining
> operation and . . . conduct its mining operations and take all actions and perform
> all duties required to maintain the Federal and State mining permits and approvals
> relating to the [Mine]."

(Id. ¶ 37.)  The bankruptcy court incorporated by reference the findings in the November 2009

Trial Order, which, as noted above, rejected COP's interpretation of the standard governing

Paragraph 5 of the Operating Agreements.  (See id. ¶¶ 32-33.)  The bankruptcy court also

reiterated that "COP [Coal] and ANR have not presented a coherent alternative to the BLM

standard with respect to 'continued operation' or 'maximum economic recovery.'" (Id. ¶ 34.)

Adopting the standard imposed by BLM regulations, the court noted that "[s]uch R2P2

plans are routinely amended to adapt to changing conditions encountered during mining, and

such amendments are routinely approved by the BLM.  Neither COP [Coal] nor ANR has any

veto power or other right of control as to the contents or approval of such plans." (Id. ¶ 41

(emphasis added).)

> The uncontested evidence is that the BLM determines whether an operator
> is in compliance with the "continued operation" and "maximum economic
> recovery" requirements contained in the Code of Federal Regulations and that this
> Court has no jurisdiction over the BLM's decisions on that matter.

> The BLM and other Federal, State and local agency [sic] responsible for
> enforcing mining regulations have the jurisdiction to interpret their regulations
> and requirements and compliance with the same.  It is inappropriate for this Court
> to speculate with respect to future actions of these agencies or to enter an order
> that may be inconsistent with or infringe on the jurisdiction of these agencies.

> So long as Buyer mines in substantial compliance with an R2P2 as

NEED

<u>approved by the BLM and substantially complies with applicable Federal, State and local laws the Buyer is not in default under paragraph 5 of the Mine Operating Agreements.</u>

(<u>Id.</u> ¶¶ 43-45 (emphasis added).)  Essentially, under the Sale Findings and Conclusions, COP Coal and ANR are not allowed to allege default and threaten termination of the Operating Agreements under Paragraph 5 unless regulators have identified a violation.

Relying on the bankruptcy court's interpretation of Paragraph 5's standard of future performance, Rhino assumed the Operating Agreements and bought the mine assets.  It then applied for an amended R2P2 with the BLM.

During administrative proceedings before the BLM (both at the agency and the administrative appeal level), COP Coal and ANR unsuccessfully raised the very same objection to the mining method.  After receiving BLM approval of its proposed R2P2 plan, Rhino began mining using the "room and pillar" method.

COP Coal and ANR then issued notices of default under Paragraph 5 against Rhino (just as they had done against the Trustee), again relying on the argument that the room and pillar method did not result in MER.  In the Notices of Default, COP Coal and ANR allege that "by preparing, submitting and obtaining approval of its modified R2P2, [Rhino] has abandoned these valuable, recoverable coal reserves."  (Appellant App. 1798 (COP Coal Notice of Default) and 1863 (ANR Notice of Default).)  They threatened to terminate the Operating Agreements.  (See Jan. 26, 2012 Notices of Default from COP Coal and ANR to Rhino (Appellant App. 1793-1807, 1858-1868).)[10]  In their Notices of Default, COP Coal and ANR unilaterally conclude that Rhino

_____

[10]COP issued the Notices of Default under Section 9 of the Operating Agreements, which says:

has violated various federal laws (even though they provide no evidence that a regulatory agency

has issued a notice of violation) and that they will terminate the Operating Agreements and take

possession of the mine in 60 days unless the default is cured.

3.      Rhino's Adversary Proceeding Against ANR and COP Coal

To avoid termination, Rhino filed an adversary proceeding against ANR and COP Coal in

the C.W. Mining bankruptcy proceedings.  Rhino sought an order from the bankruptcy court

declaring that Rhino is not in default of the Operating Agreements.  ANR and COP Coal filed

counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing,

unjust enrichment, conversion, negligence, trespass, and intentional interference with economic

relations.  That is the adversary proceeding from which this appeal arises.

Before the bankruptcy court could hear the merits of Rhino's claims, ANR and COP Coal

filed a motion with the federal district court[11] contending that the district court, not the

bankruptcy court, must hear the claims raised in Rhino's complaint (such a motion is called a

motion to withdraw reference).[12]  See DUCivR 83-7.4 (setting forth procedures for asking the

_____

        If Operator shall not comply with any of the provisions, or covenants, or
        agreements herein written and contained, and such default shall continue for a
        period of 60 days after service of written notice, by certified or registered mail, by
        Owner identifying the default and specifying with reasonable particularity the
        nature and extent thereof, then and in such event this Agreement may be
        terminated . . . .

(Appellant App. at 1793, 1858.)

        [11]See Joint Motion to Withdraw the Reference of Adversary Proceeding 11-2250 (Dkt.
No. 2 in Case No. 2:12-CV-418-TS).

        [12]The U.S. District Court for the District of Utah has referred all bankruptcy matters
(including adversary proceedings) to the District of Utah Bankruptcy Court.  Local Rule DUCiv
83-7.1 (Dec. 2014) ("Under 28 U.S.C. § 157(a), . . . all cases under Title 11 [the Bankruptcy

district court to take the adversary proceeding from the bankruptcy court).

4.      Order Denying COP's Motion to Withdraw Reference

On October 15, 2012, the district court denied in part and granted in part the motion to

withdraw the reference.  (See Mem. Decision & Order Denying Without Prejudice Defs.' Mot. to

Withdraw Reference ("Withdraw Reference Order") (Dkt. No. 49 in 2:12-CV-418-TS (D.

Utah)).)  In the portion of the order relevant to this appeal, the district court addressed

jurisdiction and authority of the bankruptcy court to decide the claims and counterclaims brought

in Rhino's adversary proceeding.

The district court held that "to the extent the parties' claims are based on the Sale Order,

. . . the bankruptcy court has jurisdiction and authority to hear the parties' claims[.]"  (Id. at 13-

14.)  It further concluded that:

> Here, Plaintiffs assert that the resolution of the parties' claims are similarly based
> on a single factual predicate—the interpretation and enforcement of the Sale
> Order.  Defendants do not dispute Plaintiffs' characterization of this case.  It is
> clear under [Travelers Indemnity Co. v. Bailey, 557 U.S. 137 (2009),] that the
> bankruptcy court has jurisdiction and authority to hear such claims. [Stern v.
> Marshall, 131 S. Ct. 2594 (2011),] forecloses the bankruptcy court from entering
> final judgment on Defendants' counterclaims only if such are "raised independent
> of federal bankruptcy law."  Or, in other words, only if the Counterclaims are
> raised independent of the bankruptcy court's interpretation and enforcement of the
> Sale Order.  Furthermore, even if the Counterclaims are not based on the
> interpretation and enforcement of the Sale Order, the bankruptcy court is not
> divested completely of jurisdiction and may still issue proposed findings of fact

---

Code] and any and all proceedings arising under Title 11 or arising in or related to a case under
Title 11 are referred to the bankruptcy judges for the District of Utah for consideration and
resolution consistent with the law.").

and conclusions of law in the same manner as provided in 28 U.S.C.
§ 157(c)(1).[13]

(Id. at 13-14.)

**Bankruptcy Court's Ruling Now On Appeal**

After the adversary proceeding was returned to the bankruptcy court, Rhino filed a

motion for partial summary judgment, asking the bankruptcy court for a determination that res

judicata and collateral estoppel COP's claims of default and counterclaims.  Rhino also sought an

injunction prohibiting COP Coal and ANR from issuing further notices for default and forfeiture

under the Operating Agreements.  The court held hearings in January and May 2013.

On September 30, 2013, the bankruptcy court, on its own initiative, dismissed Rhino's

Claims Three, Four, Five and Six[14] as well as the Defendants' counterclaims, without reaching

the merits of those claims.  The court clarified its earlier order interpreting Paragraph 5 and held

that it did not have jurisdiction over post-sale claims arising out of the non-debtor parties'

contract dispute that did not affect administration of the bankruptcy estate.  (See Sept. 30, 2013

Mem. Decision ("Dismissal Order") at 11, 14.)  "The court's jurisdiction over the Mine

---

[13]28 U.S.C. § 157(c)(1) provides that "A bankruptcy judge may hear a proceeding that is
not a core proceeding but that is otherwise related to a case under Title 11.  In such proceeding,
the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district
court, and any final order or judgment shall be entered by the district judge after considering the
bankruptcy judge's proposed findings and conclusions . . . ."

[14]In Claims Three and Four, Rhino seeks a declaration that it is not in default of the
Operating Agreements, particularly concerning its change in the mining method (as authorized
under the amended R2P2 plan approved by the BLM) and its performance under Paragraph 5.  In
Claim Five, Rhino asks the court to enjoin COP Coal and ANR from issuing notices of
termination or forfeiture under the Operating Agreements.  In Claim Six, Rhino seeks a
declaration that COP Coal and ANR may not collect damages based on Rhino's operation under
the R2P2 Plans.

Operating Agreements terminated when they were assigned to Rhino." (Id. at 11.)

Rhino now appeals the Dismissal Order, contending that the bankruptcy court erred by sua sponte dismissing Claims Three through Six for lack of jurisdiction. Rhino asks this court to reverse the bankruptcy court's decision and remand "with instructions that the Sale Order be enforced in the Adversary Proceeding according to its plain language, giving effect to the fundamental principal [sic] of res judicata." (Br. of Appellants Rhino Energy LLC and Castle Valley Mining LLC ("Rhino's Brief") (Dkt. No. 27) at 41.)

## ANALYSIS

### Statement of Jurisdiction

Under 28 U.S.C. § 158(a)(1), the court has jurisdiction to hear appeals from final orders of the bankruptcy court. Typically, a party may not appeal an order that is not final. Rhino acknowledges that the Dismissal Order did not completely resolve the underlying adversary proceeding because it did not address Counts One and Two, both of which concern the discrete issue of which royalty rates apply.

But, as Rhino points out, the court has authority to review the Dismissal Order under the collateral order exception if the party shows that the order "(1) conclusively determines a disputed question, (2) resolves an important issue separate from the merits of the action, and (3) the party would suffer irreparable harm if immediate appeal is not granted." Newton v. Lee, 677 F.3d 1017, 1023 (10th Cir. 2012). Rhino has established all three factors. (See Rhino's Reply (Dkt. No. 47) at 4-5.)

First, the Dismissal Order is the bankruptcy court's last word on Rhino's Claims Three through Six and COP's counterclaims. Second, the jurisdiction and claim preclusion issues are

13

of great importance here.  Denying Rhino the protection of the Sale Findings and Conclusions

and Sale Authorization Order would nullify a significant aspect of the sale orders (as explained

below), and put the finality of the sale of the most significant asset of the bankruptcy estate in

jeopardy.  Third, Rhino would suffer irreparable harm if the court does not resolve the dispute

now.  As Rhino notes,

> At present, ANR and COP are required to provide a 60-day notice to the court and
> Rhino before sending termination notices for the Coal Operating
> Agreements—but, [*sic*] a termination is possible.  However, even the 60-day
> notice requirement would be eliminated at the conclusion of this appeal before the
> district court, because a stipulated order requiring such notice expires then.  As for
> the irreparable harm requirement, if Rhino were made to wait until the conclusion
> of the adversary proceeding for this appeal to proceed, its $15 million investment
> in the Bear Canyon Mine could be lost. . . . [I]f this appeal were dismissed as
> interlocutory, ANR and COP may immediately issue termination notices for the
> Coal Operating Agreements based on their self-serving interpretations of the Coal
> Operating Agreements.  Rhino would be forced to re-litigate the meaning of those
> agreements . . . .

(Id. at 5 (internal citations omitted).)  For those reasons, the court will review the Dismissal

Order.

**Standard of Review**

In reviewing the bankruptcy court's Dismissal Order, the court applies the same standard

of review that governs appellate review in other appellate cases.  Troff v. State of Utah (In re

Troff), 488 F.3d 1237, 1238-39 (10th Cir. 2007).  The court applies the *de novo* standard of

review to legal conclusions and reviews factual findings for clear error.  Miller v. Bill & Carolyn

Ltd. P'ship (In re Baldwin), 593 F.3d 1155, 1159 (10th Cir. 2010).

The overall issue on appeal is whether the bankruptcy court erred in holding that it did

not have jurisdiction over Claims Three through Six in Rhino's adversary complaint and the

14

counterclaims raised by COP.  More specifically, this court must determine whether, in light of the Mootness Order and the Withdraw Reference Order, the bankruptcy court correctly determined that it did not have jurisdiction in the legal and procedural context it faced—that is, interpretation of an order that determined the standard for compliance and maneuvers by COP Coal and ANR to get around that standard.  Whether a court has jurisdiction is a legal question reviewed *de novo*.  Olcott v. Delaware Flood Co., 327 F.3d 1115, 1121 (10th Cir. 2003).

The bankruptcy court based part of its analysis on its interpretation of its Sale Findings and Conclusions and its Sale Authorization Order (or at least the scope and effect of those orders).  When a bankruptcy court's interpretation of its own order is at issue, the standard of review depends on the nature of the issue being interpreted.  When the bankruptcy court addresses a factual issue or interprets an ambiguous order, the reviewing court applies the abuse of discretion standard.  In re: Shenango Group, Inc., 501 F.3d 338, 345-46 (3d Cir.  2007).  But if the order is unambiguous and the issue presented is a legal one, the court reviews the decision *de novo*.  Id.  In addition, if different judges were involved in drafting and then interpreting the order at issue, the court need not give any special deference to the interpreting judge's conclusion.  Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.), 558 F.3d 234, 240 (3d Cir. 2009).

Here, there is no factual dispute.  The overall question of jurisdiction is a legal one.  The disputed portions of the sale orders are unambiguous.  And the bankruptcy judge was, in part, interpreting the former bankruptcy judge's November 2009 Trial Order concerning the standard of performance under Paragraph 5 (that is, the portions of the November 2009 Trial Order that were incorporated by reference into the Sale Findings and Conclusions).  For all of those reasons,

15

the court reviews the Dismissal Order *de novo*.

**The Dismissal Order**

After denying COP's request for withdrawal of the reference, the district court returned the adversary case to the bankruptcy court for resolution.  The bankruptcy court held hearings on Rhino's motion for partial summary judgment, after which it sua sponte held that it does not have jurisdiction over the Paragraph 5 dispute between COP and Rhino because it found that the dismissed claims do not arise under Title 11 (the federal bankruptcy code) and are not proceedings related to the C.W. Mining bankruptcy.  (Dismissal Order at 12.)

This court respectfully disagrees with the bankruptcy court's conclusion that the proceedings are not related to the C.W. Mining bankruptcy.  "Related proceedings" are "civil proceedings that, in the absence of a bankruptcy petition, could have been brought in a district court or a state court and could conceivably have any effect on the estate being administered in bankruptcy."  (Id. (emphasis added) (citing Gardner v. United States (In re Gardner), 913 F.2d 1515, 1518 (10th Cir. 1990)).)  This court holds that the dispute could conceivably have an effect on the C.W. Mining bankruptcy estate and so jurisdiction exists.

In the Dismissal Order, the bankruptcy court acknowledged that it has jurisdiction to enforce its orders and that it has jurisdiction to clarify the language concerning the royalty rates at issue in Rhino's first and second claim.  (Id. at 2, 2 n.1.)  But, according to the bankruptcy court, Rhino, by filing its Claims Three through Six, was attempting to expand the scope of the sale orders by asking the bankruptcy court to make "prospective findings on actual performance under the Mine Operating Agreements."  (Id.)  The bankruptcy court wrote:

Rhino is attempting to expand the scope and effect of this Court's rulings on the

Mining Operating Agreements.  The Court's rulings with respect to the Mine
Operating Agreements were for purposes of the Court's § 365 analysis of whether
there was a present ability to provide assurance of future performance, <u>not to
adjudicate prospective claims</u> among C.O.P., ANR and Rhino.  The Court's ruling
did not extend to future acts of the parties or purport to enjoin any party.

(<u>Id.</u> at 10-11 (emphasis added).)

The bankruptcy court identified what it called the "crux of the issue" before the court:

What does my statement [in the Sale Findings and Conclusions] "So long as
Buyer mines in substantial compliance with an R2P2 as approved by the BLM and
substantially complies with applicable Federal, State and local laws the Buyer is
not in default under paragraph 5 of the Mine Operating Agreements" mean?

(<u>Id.</u> at 1.)  The bankruptcy court then summed up the relevant portion of its Sales Findings and

Conclusions and its Sale Authorization Order:

**"What the Court Said":** In summation, this Court's consideration and
interpretation of the Mine Operating Agreements were limited to a consideration
of the Trustee's ability to assume and assign them under § 365.  In this context,
what the Court said was: (1) For purposes of § 365(b), there has been a default in
payment of royalties, but that default may be cured, (2) For purposes of § 365(b),
there are no other defaults under the Mine Operating Agreements, (3) For
purposes of §§ 365(b)(1)(c) and 365 (f)(2)(b), the Trustee and Rhino have
established adequate assurance of future performance, and (4) The Mine
Operating Agreements may be assumed and assigned to Rhino.

(<u>Id.</u> at 9-10 (emphasis added).)

Although the bankruptcy court accurately stated what it accomplished in its Sale Findings

and Conclusions, it left out the important fact that the order also set the standard for future

compliance with Paragraph 5.  That standard is being challenged, once again, by COP, this time

through indirect means, and Rhino is asking the bankruptcy court to enforce that standard and

protect the rights granted by the bankruptcy court.

The standard was created as a matter of law when the bankruptcy court interpreted

Paragraph 5. The bankruptcy court recognized the necessity of providing an operator with concrete and definable guidance in its performance.  To accomplish that, the standard must necessarily continue beyond the closing of the sale.  Even though the Operating Agreements are no longer property of the C.W. Mining estate, they retain the shape they took when they were assumed.  To hold otherwise would effectively withdraw a significant part of the sale orders.

COP Coal and ANR, whose arguments were rejected in the bankruptcy court's Sale Findings and Conclusions, are now trying to get another bite at the apple—their notices of default rehash previously rejected objections in a different forum.[15]  In that order, the bankruptcy court said that "[n]either COP nor ANR has any veto power or other right of control as to the contents or approval of [R2P2] plans.  (Sale Findings and Conclusions ¶ 41.)  Nevertheless, COP Coal and ANR, by issuing the Default Notices, are apparently attempting to veto the content of the new R2P2 and, by doing so, undo the sale approved by the bankruptcy court, a result they were not allowed to obtain in their objections and appeals in the bankruptcy proceedings.

Two earlier district court rulings in the bankruptcy proceedings highlight that fact.  The first is the June 7, 2012 Order dismissing COP's appeal of the bankruptcy court's Paragraph 5 interpretation as moot (the Mootness Order).[16]  The second is the Withdraw Reference Order.

---

[15]Rhino points to a colloquy with the bankruptcy court judge about res judicata.  (See Br. of Appellants (Doc. No. 27) at 13-16, 32.)  Contrary to Rhino's characterization of the bankruptcy judge's statements from the bench, that was not a formal argument and the judge's statements from the bench have no legal effect.  The content of the discussion simply provides further clarification of what the bankruptcy judge intended in its Sale Order.  The court does not make a determination about whether COP Coal's and ANR's Notices of Default are barred by the doctrine of claim preclusion.

[16]The June 7, 2012 Mem. Decision & Order Granting Motion to Dismiss Appeal as Moot and Interlocutory is the "Mootness Order."

The holdings by the district court in the Withdraw Reference Order and in the Mootness

Order apply as law of the case.

> The law of the case doctrine provides when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  Thus when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.  This principle applies to all issues previously decided, either explicitly or by implication.

Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995) (internal citations and

quotation marks omitted) (emphasis added).  See also Bird v. Winterfox, LLC (In re Kitts), 447

B.R. 330, 338 (Bankr. D. Utah 2011) ("[T]he Court is not writing on a clean slate.  The Court has

thoroughly reviewed the record in this case and agrees . . . that this line of argument has already

been ruled upon and is the law of the case.").

In addition, under the mandate rule the Withdraw Reference Order applies to the

bankruptcy court's analysis of Rhino's motion for partial summary judgment in the adversary

proceeding.  "The mandate rule is a corollary to the law of the case [doctrine] requiring trial court

conformity with the appellate court's terms of remand."  Dish Network Corp. v. Arrowood

Indemnity Co., 772 F.3d 856, 864 (10th Cir. 2014).

> The mandate rule, which is a corollary or specific application of the law of the case doctrine, prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand.  This prohibition covers issues decided both expressly and by necessary implication, and reflects the jurisprudential policy that once an issue is litigated and decided, that should be the end of the matter.  This rule is essential to the orderly administration of justice, as it is aimed at preventing obstinate litigants from repeatedly reasserting the same arguments and at discouraging opportunistic litigants from appealing repeatedly in the hope of acquiring a more favorable appellate panel.

19

United States v. Pineiro, 470 F.3d 200, 205 (5th Cir. 2006) (internal citations and quotation

marks omitted) (emphasis added).

When the district court denied COP's motion for withdrawal of the reference and

returned the claims and counterclaims to the bankruptcy court for adjudication in the adversary

proceeding, it stated that "to the extent the parties' claims are based on the Sale Order, the

bankruptcy court has jurisdiction and authority to hear such claims."  (Withdraw Reference Order

at 13.)  It further concluded that the parties' claims are based on the Sale Order:

> Here, Plaintiffs assert that the resolution of the parties' claims are similarly based
> on a single factual predicate—the interpretation and enforcement of the Sale
> Order.  Defendants do not dispute Plaintiffs' characterization of this case.  It is
> clear under [*Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009)] that the
> bankruptcy court has jurisdiction and authority to hear such claims. . . . [E]ven if
> the Counterclaims are not based on the interpretation and enforcement of the Sale
> Order, the bankruptcy court is not divested completely of jurisdiction and may
> still issue proposed findings of fact and conclusions of law in the same manner as
> provided in 28 U.S.C. § 157(c)(1).

(Id. at 13-14 (emphasis added).)  By failing to rule on the merits of the claims and issues

addressed in the Withdraw Reference Order,  the bankruptcy court erred because it did not follow

the district court's mandate.

Additionally, the bankruptcy court erred under the law of the case doctrine by dismissing

Claims Three through Six and the counterclaims on jurisdictional grounds (that is, finding no

effect on the estate).  The Mootness Order addressed the very same objection COP makes

indirectly in the Notices of Default.  In COP's earlier appeal of the sale orders to the district

court, COP contended that "the bankruptcy court erred in its interpretation of the Continuous

Operations Clause found in the COP [Operating] Agreement."  (Mootness Order at 5.)  In that

order, the district court agreed with Rhino and the Trustee that COP, "by asking this Court to

20

change the interpretation of the Continuous Operations Clause after the sale has closed, impermissibly seeks to change the terms of the sale to Rhino."  (Id. at 10 (internal citation and quotation marks omitted).)  That is what COP Coal and ANR are now attempting to do through their Notices of Default.

The district court found that Paragraph 5 "is intimately related to the final sale [of the mine assets, including the Operating Agreements] as memorialized in the Sale Order."  (Id. at 14.)  The court found that "COP's assertion—that it is attempting to define the contours of the COP Agreement and establish the correct interpretation of those terms as the parties move forward—is disingenuous."  (Id.)  The court characterized COP's appeal as "seek[ing] an interpretation of the Continuous Operations Clause of the COP Agreement that provides it with unfettered discretion to allege a default.  The Court finds such relief would adversely affect the sale of assets to Rhino and, thus, the validity of that sale."  (Id. at 15 (emphasis added).)

The district court said "[t]he mootness question turns on what relief is available to [COP] if it were to prevail in this appeal.  [Bankruptcy Code Section] 363(m) forecloses any remedy . . . that would affect the validity of the sale."  (Id. at 10 (internal citations and quotation marks omitted).)  And then the district court agreed with Rhino that COP, "by asking this Court to change the interpretation of the Continuous Operations Clause after the sale has closed, . . . impermissibly seeks to change the terms of the sale to Rhino." (Id. (internal citations and quotation marks omitted).)

The district court cited to Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.), 895 F.2d 845 (1st Cir. 1990), a case dealing with a strikingly similar set of facts and legal issues. The Anheuser-Busch court noted that "[i]t is axiomatic that 'one cannot challenge a central

theme of a purchase without challenging the validity of the sale itself . . . ." <u>Id.</u> at 849.

As in <u>Anheuser-Busch</u>, the outcome of the proceeding here could conceivably affect the C.W. Mining estate.[17]  Indeed, in the proceedings leading up to the sale, the <u>bankruptcy court</u> concluded that "[t]he assumption and assignment of the Mine Operating Agreements are <u>integral</u> to the Sale Agreement[.]"  (Sale Findings and Conclusion ¶ 53 (emphasis added).)  And in its related August 4, 2010 Sale Authorization Order, the bankruptcy court ordered that

> [t]he Buyer [Rhino Energy and Castle Valley] is hereby granted and is entitled to all of the protections provided to a good faith buyer under § 363(m) of the Bankruptcy Code.  <u>The Assignment of the Mine Operating Agreements</u> pursuant to § 365 of the Bankruptcy Code <u>is an indispensable part of a sale of the Mine Assets under this Order</u> and is fully included within the protection given the Buyer under § 363(m).

(Sale Authorization Order ¶ 30 (emphasis added).)

The bankruptcy court's interpretation of Paragraph 5 in its Sale Findings and Conclusions was crucial to selling the mine assets.  First, Rhino expressly represents that it relied on the interpretation and holding when it bid $15 million, and that it would not have bought the mine without that interpretation.  (Rhino Brief at 25-26, 38.)  Second, the bankruptcy court noted that applying the standard advocated by COP would result in "no standard at all."  (Sale Findings and Conclusions ¶ 32; November 2009 Trial Order ¶ 19.)  In other words, without a standard, no purchaser would be able to operate with any certainty.

COP Coal and ANR have filed Notices of Default based on their interpretation of

---

[17]The bankruptcy court cited to <u>Gardner</u> to support its determination that the current dispute does not relate to the bankruptcy proceeding.  (<u>See</u> Dismissal Order at 12.)  <u>Gardner</u> is factually distinguishable because "neither [the debtor] nor the bankruptcy estate [were] affected by the dispute" before the court.  <u>Gardner</u>, 913 F.2d at 1518.  Here, the dispute directly affects the bankruptcy estate, as the court articulated in the Withdraw Reference Order and the Mootness Order.

Paragraph 5, despite the fact that their authority to do so was foreclosed by the bankruptcy court's Sale Authorization Order, which expressly states that neither COP Coal nor ANR has "veto power or other right of control as to the contents or approval of updated R2P2's." (Sale Authorization Order ¶¶ 10, 12(c).) The issues raised by the Notices of Default necessarily affect the sale because the very same arguments have been expressly rejected and Rhino relied on the bankruptcy court's interpretation.

Because the issues are related to the bankruptcy proceedings, the bankruptcy court has jurisdiction over Claims Three through Six and the related counterclaims.

## ORDER

For the reasons set forth above, the court holds that the bankruptcy court erred when it dismissed Claims Three through Six and the related counterclaims for lack of jurisdiction. Accordingly, the decision of the bankruptcy court is reversed. The court remands the case and directs the bankruptcy court to complete its consideration of Rhino's motion for partial summary judgment in a manner consistent with this order, the Withdraw Reference Order, and the Mootness Order.

DATED this 10th day of July, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

23